# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:24-CR-04023-RK-1 |
| JONATHAN JOVANI WONG, | ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

Pending before the Court is Defendant Jonathan Jovani Wong's Motion to Suppress Evidence and Statements. (Doc. 39). The Government has filed its suggestions in opposition. (Doc. 47). The Court held a hearing on this matter on April 24, 2025. (Doc. 54). The Court granted leave for the parties to file supplemental briefing, which Mr. Wong filed on June 6, 2025, and the Government filed on June 13, 2025. (Docs. 62, 65). The issue is now ripe for consideration. For the reasons that follow, it is recommended that the motion be DENIED.

## I. Findings of Fact

Based on the evidence presented at the hearing, the Court submits the following proposed findings of fact:

### Interview of Mr. Wong on February 13, 2024

1. Sgt. John Lehman has been employed by the Jefferson City Police Department ("JCPD") for approximately eleven years. He has training and experience in investigating crimes involving child exploitation and interviewing suspects. (Tr. 4:1-9).

2. During the week of February 13, 2024, Sgt. Lehman responded to a call regarding a sexual assault investigation involving a minor victim ("MV"). Upon speaking with the MV and

MV's parents, and "after gaining some probable cause," Sgt. Lehman contacted and transported Mr. Wong to the JCPD for an interview. (*Id.* 4:25-5:14; 6:2-6).

3. During Mr. Wong's interview at the JCPD, Sgt. Lehman read him his *Miranda* rights from a *Miranda* form, which Mr. Wong signed. (*Id.* 6:20-23).

4. Mr. Wong invoked his right to an attorney at the end of the interview, and Sgt. Lehman did not ask any more "guilt-seeking" questions. (*Id.* 7:10-12. 8:4-9).

5. At that time, Sgt. Lehman had no reason to believe that Mr. Wong's cell phone was used in the alleged crime, so Mr. Wong was released from custody with his cell phone. (*Id.* 8:19-23).

**Forensic Interview of Minor Victim on February 21, 2024**

6. On February 21, 2024, Sgt. Lehman conducted a forensic interview of MV. During that interview, MV disclosed that Mr. Wong's cell phone had been used during the alleged sexual abuse. (*Id.* 9:4-17).

**Interview of Mr. Wong on February 22, 2024**

7. On February 22, 2024, Mr. Wong was arrested relative to the sexual abuse investigation. (*Id.* 9:4-13).

8. Sgt. Lehman asked Mr. Wong if he was willing to talk, and Mr. Wong indicated that he would speak with Sgt. Lehman. (*Id.* 10:15-23).

9. Mr. Wong's cell phone was seized based on MV's statements to Sgt. Lehman. Sgt. Lehman intended to obtain a search warrant for the cell phone and considered it to be in police custody. (*Id.* 9:25-10:8).

10. After arriving at the JCPD, Sgt. Lehman again read Mr. Wong his *Miranda* rights. (*Id.* 11:10-12). After asking whether he understood those rights, the following exchange took place:

Mr. Wong: "I tried to initiate one of those rights and you keep saying I can't."

Det. Lehman: "Listen, do you understand…I'm going to ask you some questions here in a little bit…I know you asked to talk to any attorney beforehand…you have had a week or whatever. I'm not going to ask you any questions if you were to invoke your right to an attorney. Is that what you are doing?"

Mr. Wong: "I was willing to speak originally but you said I couldn't speak with an attorney first and then I said, okay but now you are saying…"

Det. Lehman: "I said you're not going to be able to call one at this time, you're in custody. Does that make sense? You're not going to be able to call an attorney right now."

Mr. Wong: "I can't call my attorney?"

Det. Lehman: "Who is your attorney?"

Mr. Wong: "Daniel Dodson."

Det. Lehman: "Daniel Dodson. I am not going to allow you to call him right now."

Mr. Wong: "I don't understand why. I don't understand."

Det. Lehman: "You're in custody…Do you wish to speak with me or not, is the question."

Mr. Wong: "I'm just asking you. I get it, I am just asking why is it against…he is just going to be here for the questioning, is he not? Just like the *Miranda* says."

Det. Lehman: "If Mr. Dodson wishes to set up an interview with us that is fine...if you invoke your right to an attorney, I am not going to ask you any questions.

(Gov't Exh. 2 at 00:00:45-00:02:15).

11. Sgt. Lehman explained to Mr. Wong that an interview with his attorney could be arranged later. He asked Mr. Wong if he was willing to speak with him without his attorney present

and he eventually confirmed that he would. (Tr. 11:24-12:7). Specifically, the following exchange took place:

Mr. Wong: "This is questioning here, isn't it?"

Det. Lehman: "Yeah, I am questioning you here now. If me and your attorney want to set up a time for different questioning with him present, I will do that…but I am not saying we're not doing it right now. Are you invoking your right to talk to an attorney or do you wish to speak…."

Mr. Wong: "Not yet. I'm not invoking anything yet."

Det. Lehman: "Do you wish to speak to me without your attorney present right now?"

Mr. Wong: "For now yes."

(Gov. Exh. 2 at 00:04:35-00:05:17).

12. Mr. Wong later asked if he could retrieve phone numbers from his cell phone. Sgt. Lehman informed him that he would not be allowed to manipulate or access his phone, and that if he needed phone numbers, he would have to provide the cell phone passcode so Sgt. Lehman could retrieve them for him. (Tr. 16:16-24).

13. Mr. Wong gave Sgt. Lehman the cell phone passcode which Sgt. Lehman wrote down. (*Id.* 17:11-22).

14. The passcode to Mr. Wong's cell phone was a 9-dot swipe code with 389,112 different possible passcode options. (*Id.* 66:12-15).

15. In addition to a 9-dot swipe code, Mr. Wong's cell phone could use a numerical passcode option and a biometrics passcode option via fingerprint (*Id.* 66:12-24).

16. Sgt. Lehman applied for and was granted a search warrant for Mr. Wong's cell phone. (*Id.* 18:11-15; 61:11-15).

### Forensic Examination of the Cell Phone on February 23, 2024

17. Det. Jeremy Bowman has been employed by the JCPD for fourteen years. His responsibilities include cell phone forensics, specifically extracting and analyzing data from devices. (*Id.* 57:13-21; 57:24-58:9).

18. Using the 9-dot swipe code provided to him by Sgt. Lehman, Det. Bowman accessed Mr. Wong's cell phone and conducted a forensic examination using Graykey software. (*Id.* 58:20-24; 61:6-7).

19. Det. Bowman noticed that there were images of a Knox secure folder on the cell phone. Graykey was not able to extract the data from the Knox secure folder, but Det. Bowman performed a hand search to activate it. The secure folder prompted him to enter a swipe code, and after trying the same 9-dot swipe code that unlocked the cell phone, he was able to gain access to the secure folder. (*Id.* 62:16-63:8).

20. Det. Bowman did not know that the passcode to access the cell phone would have been the same as the passcode to access the Knox secure folder. (*Id.* 63:2-13).

21. Det. Bowman discovered one video depicting sexual abuse of MV inside the trash folder of the cell phone's regular gallery and twenty-five videos depicting the sexual abuse of MV in the trash folder of the secure folder in the Knox secure folder. (*Id.* 58:20-24; 60:2-5; 64:21-65:2).

22. If Det. Bowman did not have the passcode to the cell phone, he would have used the Graykey software and employed the brute force option which would have provided the cell phone passcode. (*Id.* 63:14-17).

23. Brute force is the process of iterating through numbers until the right combination is found. (*Id.* 92:8-11).

24. During the forensic examination, Det. Bowman consulted Det. Cody Bounds, a certified computer forensic examiner with the Boone County Cyber Crimes Taskforce, on how to preserve the videos. Det. Bowman used a department-issued camcorder to physically record the videos while they played on the phone so the device's metadata would not be altered. (*Id.* 63:18-64:20).

25. Det. Bounds has eleven years of experience on Boone County's Cyber Crimes Taskforce. (*Id.* 86:2-5).

26. Mr. Wong's cell phone is a Samsung Galaxy S23 which uses file-based encryption tied to the cell phone passcode. (*Id*. 89:9-14; 101:1-12).

27. A Samsung Galaxy S23 employs several passcode systems, including biometric access, a passcode, a gridlock pattern, or an alphanumeric password. (*Id.* 89:15-19).

28. A gridlock pattern has just under 400,000 password possibilities. (*Id.* 89:20-90:9).

29. Based on the phone and model number, Det. Bounds was able to determine that the Samsung Galaxy S23 could be brute forced. (*Id.* 91:5-16).

30. Det. Bounds also has personally examined Galaxy S23s where he did not have the passcode and has been successful in obtaining the passcode through brute force. (*Id.* 92:23-93:2).

31. Det. Bounds determined that it would have taken Graykey 5 minutes and 49 seconds to brute force a Samsung Galaxy S21 with the same passcode as Mr. Wong's passcode. (*Id.* 93:3-9; 97:14-23).

32. Even without having the cell phone model, build number, passcode, or grid pattern, Det. Bounds testified that Graykey would have been able to brute force the cell phone. (*Id.* 109:9-110:1).

33. It is possible that when using the brute force option through Graykey, it could potentially damage, or "brick" a phone. If the phone does "brick," there are tools that are built in to start a recovery process that returns the phone to the same state it was in before the phone started to "brick." (*Id.* 103:17-104:7).

34. In Det. Bounds' experience of employing brute force on approximately 642 mobile devices, a brute force has "bricked" a phone very infrequently. (*Id.* 110:8-111:9). He has never had a phone that permanently "bricked" while using Graykey. (*Id.* 104:6-7).

## II. <u>Discussion</u>

On May 14, 2024, a federal grand jury in the Western District of Missouri returned an indictment against Mr. Wong. (Doc. 1). Mr. Wong is charged with two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). (*Id.*). On March 7, 2025, Mr. Wong filed the instant motion seeking suppression of "all evidence retrieved by the Government from the black Samsung S23 cellular telephone." (Doc. 39 at 1).

### A. Legal Standard

The Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect an individual's Fifth Amendment privilege against self-incrimination, a custodial interrogation must be preceded by warnings of an individual's right to remain silent, that any statement may be used against him or her, and that he or she has the right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

With respect to the impact of requesting counsel during a custodial interrogation, it is well-settled that after a defendant expresses a desire to have an attorney present during questioning, he

"is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversation with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). An interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980)). "The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010). The Supreme Court has established that a fourteen-day break in custody before reinterrogation is sufficient to ensure that the continuation of the *Edwards* presumption reaches the correct result "most of the time." *Id.* at 110-11. Confessions obtained after a two-week break in custody and a waiver of *Miranda* rights are most unlikely to be compelled. *Id.* at 111. "A voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." *Id.* at 105.

The exclusionary rule, "when applicable, forbids the use of improperly obtained evidence at trial." *Martinez Carcamo v. Holder*, 713 F.3d 916, 922 (8th Cir. 2013) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009).) The Supreme Court has applied the exclusionary rule to violations of the Fifth and Sixth Amendments "to deter police from violating constitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). For the inevitable discovery exception to the exclusionary rule to apply, the government must establish by a preponderance of

the evidence that there is "(1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) there was a presumption active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013).

**B. Mr. Wong's statements at the interview on February 22, 2024, were involuntary.**

Mr. Wong asserts that Sgt. Lehman's reengagement with Mr. Wong nine days after he invoked his right to an attorney violates the Supreme Court's rule in *Shatzer* that a fourteen-day break in custody prior to re-engaging a suspect is necessary. (Doc. 62 at 2). The Government argues that although the February 22, 2024, interview fell short of the *Shatzer* rule, the goals of the rule were accomplished during the period Mr. Wong was released. (Doc. 65 at 2-3). This Court recommends that the District Judge find that the interview on February 22, 2024, violated the *Shatzer* rule and the statements Mr. Wong made during that interview were involuntary.

The parties agree that Mr. Wong unequivocally asserted his right to an attorney during the interview on February 13, 2024. Because *Shatzer* requires fourteen-day break in custody, officers could not have initiated a new custodial interrogation of Mr. Wong without counsel present until February 28, 2024, unless Mr. Wong himself initiated further communications with the police. *See Edwards*, 451 U.S. at 484-85. This is not the case here. After being released on February 13, 2024, Mr. Wong did not communicate with the police until he was arrested on February 22, 2024, only nine days after the initial custodial interrogation. This is a clear violation of *Shatzer*'s fourteen-day break-in-custody rule, which was put in place to "provide[] plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *See Shatzer*, 559 U.S. at 110.

At the time of Mr. Wong's arrest, in the absence of counsel, Sgt. Lehman asked Mr. Wong if he wished to speak with him. (*Id.* 10:15-23). Mr. Wong was transported to the JCPD, where Sgt. Lehman again clearly initiated an encounter in the absence of counsel by re-reading him his *Miranda* rights, asking whether he would waive them, and advising him that he would be questioned. The Court finds that the statements made by Mr. Wong in the second interview were not made after a break in custody sufficient to dissipate the coercive effect of his initial custodial encounter and Mr. Wong did not initiate communications, exchanges, or conversations with the officers. Accordingly, the *Edwards* presumption of involuntariness applies to Mr. Wong's statements made during the interview on February 22, 2024, including the statement Mr. Wong made giving his cell phone passcode to Sgt. Lehman.

**C. The evidence seized from Mr. Wong's cell phone should not be suppressed because the inevitable discovery doctrine applies.**

Mr. Wong argues that the exclusionary rule applies and the evidence obtained from his cell phone should be suppressed. (Doc. 39 at 15; Doc. 62 at 4-8). The Government argues that the evidence obtained from Mr. Wong's cell phone should not be suppressed because the inevitable discovery exception to the exclusionary rule applies. (Doc. 47 at 11; Doc. 65 at 3-6). This Court recommends that the District Judge find that the inevitable discovery exception applies.

Even though Mr. Wong's Fifth Amendment rights were violated and the passcode was acquired unlawfully, the Government has established by a preponderance of the evidence that there was a reasonable probability that the videos on the cell phone would have been discovered by lawful means and that there was an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation. On February 22, 2024, Sgt. Lehman applied for and received a search warrant to search the cell phone after MV stated that the cell phone was used during the alleged sexual abuse. (Tr. 61:11-15). During his forensic examination on February 23,

2024, Det. Bowman accessed the cell phone by using the passcode that Sgt. Lehman obtained from Mr. Wong. (*Id.*). Det. Bowman used that same passcode to gain access to the Knox secure folder, which contained the videos depicting the sexual abuse of MV. Based on both Det. Bowman's and Det. Bounds' testimony, the Graykey device has a brute force option, which would have given detectives the passcode to Mr. Wong's cell phone in under six minutes. (*Id.* 60:13-23; 97:14-23).

Without the passcode, Sgt. Lehman would have still applied for a search warrant. After a search warrant was obtained, Det. Bowman would have extracted Mr. Wong's cell phone using Graykey and ultimately would have gained access to the cell phone. (*Id.* 62:9-15; 97:14-23). Det. Bowman would have tried this same passcode on the Knox secure folder, which would have given him access to the contents therein. (*Id.* 63:2-17). *See United States v. Morales*, No. 4:21CR263 MTS (SPM), 2022 WL 2104091, at *8 (E.D. Mo. June 10, 2022) (inevitable disclosure doctrine applied where defendant declined to unlock phone by entering his passcode, but agent would have been able to successfully unlock the phone and perform an extraction using an FBI forensic tool).

Mr. Wong argues that unless the Government can assure that the grid passcode played "no role" in the retrieval of the encrypted information from the deleted portion of the phone, then the Government failed to meet its burden. (Doc. 62 at 6-7). However, this Court finds that the Government has met its burden by a preponderance of the evidence. Without the cellphone passcode, there is a reasonable probability that Graykey would have been able to brute force the phone. Using the passcode provided by Graykey, Det. Bowman would have been able to open the Knox secure folder, as both passcodes were the same. (Tr. 80:10-81:3). Although brute force entry may have disabled the device, Det. Bounds testified that the recovery tools would have enabled the cell phone to return to its original state. He also has never had a phone permanently "brick" during the brute force process. (*Id.* 103:17-104:7; 110:8-111:9).

Mr. Wong also argues that there is no way of assessing whether law enforcement in 2024 would have been able to brute force a Samsung S23. (Doc. 62 at 7). In this case, Det. Bounds used a Graykey device with 2025 software to brute force a Galaxy S21. (Tr. 100:6-19). It is from that test case that Det. Bounds determined that Graykey would have brute forced the Galaxy S23 in under six minutes. (*Id.* 97:14-23). However, Det. Bounds' testified that there is no additional hardware security between an S21 and an S23 that would make the S21 more "brute forcible" than the S23. (*Id.* 95:1-8). He further testified that the only difference between the two phone models is that the S21 would run slower and may have taken longer to brute force into that the S23, which has more processing power. (*Id.* 96:2-15). Based on Det. Bounds' testimony, it appears that it is not a matter of if the S23 would have been brute forced, but rather how long the process would have taken. Therefore, the Government has proved beyond a preponderance of the evidence that there was a reasonable probability that the videos would have been discovered by lawful means, and Mr. Wong's argument fails.

Accordingly, this Court recommends that the District Judge find that the inevitable discovery doctrine to the exclusionary rule applies. Therefore, Mr. Wong's Motion to Suppress should be denied because Det. Bowman's discovery of the videos on Mr. Wong's cell phone was inevitable absent the Fifth Amendment violation.

### III.  Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant Jonathan Jovani Wong's Motion to Suppress. (Doc. 39).

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to

file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dates this 25th day of June, 2025, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*
Willie J. Epps, Jr.
Chief United States Magistrate Judge